UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

**RECEIVED**

APR 0 7 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

KABIL ANTON DJENASEVIC

:
:
: Case No. 07-CV-1685(RWR)
:
v.                                    :
:
:
:
EXECUTIVE OFFICE OF U.S. ATTORNEY(s) et al. :

LEAVE TO FILE AFFIDAVIT WITH
NEW EXHIBIT EVIDENCE TO SUPPORT
COMPLAIINT RULE 56(e)(1)

I, Kabil Anton Djenasevic, do swear, subject to the perjury laws, that I have first hand knowledge and am sound to testify in this matter, state the following facts:

On September 07, 2007, I filed brief in support: Title 5 U.S.C. §552(a) (g) (1) (c) (g) (4) challenging the validity of records used to draw adverse decision(s) and support extradition from another country. Violation of 40 Fed. Register 28, 944, 40 Fed. Register 28, 965. Maintanance of accurate records with case law to back claim. Post marked Sep. 28, '07 with certified mail #7006 21500004-76496059-Pro Se.

On September 24, '07, this Honorable Court issued Order and allowed complaint to be filed forma pauperis, as soon as Plaintiff provide copies in accordance with 28 U.S.C. §1915. Copies were

1

provided to reflect March 7, 2007, to Sep. 25, 2007, cert. mail #70062150000475496056. On January 31, 2008, Defendant's moved for summary judgement/dismissal and other "Aerobatics." Nonetheless defendant's counsel does bring out one of my many points and "material fact" since this is the records they have. Material Fact is the word games being played in this case meaning this. At 3 of 15 defense counsel motion for summary judgement. "On August 1, 2005 Plaintiff subsequently plead guilty with |condition| that he serve his prison sentence in Montenegro, a Country once part of the former Yugoslavia which |had| a bilateral agreement with the U.S. Judge Kowachevich in District Court and Judge Kravich in the 11 Circuit Court, are federal judges that represent the law. How is it possible they would say Montenegro and Yugoslavia |had| or |have| a "bilateral" treaty when they don't and they never |had|! Emphasis. Plus, in reference to |Condition| that he serve his prison sentence in Montenegro. My point being in U.S.P. Allenwood! Adverse Decision, as I provided the court with B.O.P. Program statement answer Exhibits #10. Furthermore, now **IN INITIAL BRIEF I PRESENTED ON PAGE FOUR, FIVE QUESTIONS TO THE COURT BEING:**

1. "Did U.S. State Department |proffer| "False and Misleading statements to another COuntry's EBASSY for EXTRADITION to the UNITED STATES via "INTERNATIONAL EXTRADITION TREATY' for a person within their jurisdiction (South Africa), where even the alleged Party was a "CITIZEN OF MONTENEGRO" and nOt of the sending COUNTRY of SOUTH AFRICA...

2. "DID" US DRUG ENFORCEMENT AGENCY AND US ATTORNEY'S OFFICE

2

have knowledge of an "ENTRAPMENT/CREATED INCIDENT" by an informant

working under cover that [drafted and maintained] such references

in its files and transmitted to SOUTH AFRICAN EMBASSY to obtain the

Custody of the Pro Se Plaintiff?

    3. "DID" the state of Florida and Drug Enforcement Agency(s)

constructively [amend] without leave of the Court consent decrees

to search Bank(s) for "SAFE DEPOSIT BOXES:

> ie: January 3, changed to Jan. 4 and changed BANK NAMES
> from B.O.F.A. to UNION BANK....YEAR OF 2001.

    4. Was "CONSENT DECREE" [COERCED] by via THREATS of INDICTING

PLAINTIFF'S FIANCE if he refused consent?

    5. Was there in existence "STATEMENTS COERCED" that was

referenced and now now where to be FOUND? with alleged stated consent

form?

    Please see Exhibit number 2 which is sworn affidavit of DEA

Ron Gear. See page 6 at 14 and see page 8 at 18.

    There are other documents that are being witheld. <u>Namely an</u>

<u>8½ by 11 photocopy of Helen Mafilas, now Helen Djenasevic,</u> that

was used by police to threaten me [witheld]. U.S.C. §552(b)(3)?

Exhibits Evidence 1-10.
1 Forged D.O.J. D.E.A. Consent to search
2 Sworn Affidavit by Ronald L. Gear 11-25-02
3 Sworn by A.U.S.A. Kathy M. Paluso 11-25-02
4 Booking Record 1/3/01 [Time 19:r48?]
5. Affidavit of Anso Van Deventer October 31, 2002.
6 Request for Extradition 11-26-02
7 Warrant of Arrest October 31, 2002
8 (a) Certification #8(b) by Ernestine Gilpin
9 Only copy to Court photo proof sheet of search developed at
Eckerd Drugstore #Q00187 date 1/7/01
10 3 inmate request to staff forms (j1) dated 7-28-06 (b) 12-7-07
(c) December 29, 07.

The facts are simple: I did not consent to First Union on th 3rd of January and on the 4th I did not sign a consent to search form DEA as sworn by Ronald L. Gear. I did not sign a consent form or otherwise to search #908, 851 Bayway Blvd. Clearwater, Florida or otherwise verbally. There never was or ⌊is⌋ in existence a bilateral treaty pluse I am of American Albanian Background. Why would I have anything to do with Serbia. Serbia was never at the forefront of the plea. My wife from South Africa Helen Djenasevic does not know the history. She wrote a letter and judge Kravich, misquote and does not finish the sentence being: Work with us If the Court Grants it (See 11th Cir. opinion pg 13) so: Material Fact and Exhibit #11 now: Knowingly and intentionally placed on record to draw Adverse decision! 5 USC §552a (e)(5)

The record is being falsely manipulated with ⌊misnomer⌋ to imply or justify a false record. (Adverse Decision USC §552(a)). The duplicious wording  done and vacillating and the fact the Kathy J. M. Paluso states at pleadings that she looked into ⌊it⌋ on Friday (i.e. Bilateral treaty with Montenegro) is a strong indication of collusion with Counsel Weisbrod. Due to the fact that on 8-1-05 I was dressed out for trial and with threats on 7-28-05 suppression hearing to my wife who testified via video, and who is caring for our 3½ year old daughter at the time. On 8-1-05 David Weisbrod tells me before trial that a superceding indictment for my wife is forth coming if I don't resolve this case in a plea." But if I do plead guilty I would get a bilateral treaty and under 4107(b)(2) I will be resenteced to Montenegro Laws.

4

In federal file there are in existence statement by police and informants as well as video and audio that are witheld. U.S.C. §552(b)(3). They are false and misleading articles that must be cured. IT IS THIS PLAINTIFF, KABIL ANTON DJENASEVIC, RIGHT TO HAVE ACCURATE INFORMATION IN HIS FILES.

Defendant's fail to support their defense with affidavits rule 56(c). Defense Counsel does not sign or date his motion. Rule 11(a). I object for the record attempt by counsel to manipulate or misconstrue the facts and issues with misquotes.

I DENY all DEFENSES RAISED BY DEFENDANTS IN THEIR MOTION FOR SUMMARY JUDGEMENT OR DISMISSAL THAT ARE EXPRESSLY ADMITTED TO.

Based on this affidavit and the need for full disclosure and incamera hearing to assess the damage and inaccuracies in the files I believe appointment of counsel and disclosure of such needed files that even the federal bureau of prisons maintains and uses at USP Allenwood to Draw adverse decisions(s) so therefore requires a hearing and to see how much information is incorrect, false and misleading to plaintiff Djenasevic that has dire consequences and must be corrected: 28 U.S.C. §1746.

Respectfully submitted,

_____
Kabil Anton Djenasevic
Pro Se Plaintiff
USP Allenwood
PO Box 3000
White Deer, PA 17887

Date: April 1, 2008

5

# PROOF OF SERVICE

I certify that on ~~March 31-08~~ *April 2nd 08 (Karp)* (date) I mailed a copy of this brief and all attachments via first class mail to the following parties **at the addresses listed below:**

① U.S. District Court
District of Columbia
333 Constitution ave N.W.
Washington D.C. 20001

② U.S. Attorney's Office
District of Columbia
555 4th St N.W.
Washington DC 2000

# PROOF OF SERVICE FOR INSTITUTIONALIZED OR INCARCERATED LITIGANTS

In addition to the above proof of service all litigants who are currently institutionalized or incarcerated should include the following statement on all documents to be filed with this Court:

I certify that this document was given to prison officials on ~~March 31-08~~ *April 2nd (Karp)* (date) for forwarding to the Court of Appeals. I certify under penalty of perjury that the foregoing is true and correct. 28 U.S.C. §1746.

_____
Signature

Dated: ~~March 31-08~~ *April 2- 08 (Karp)*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

Kabil Anton Djenasevic
  Plaintiff Pro se

                                Judge : Roberts

    -v-

                                Case: 07-cv-1685

Excutive Office of US attorney et al;
  Defendants

Plaintiff Pro Se  OPPOSITION
To  Defendant(s) Counsel's
Request For Summary Judgement
and or in the Alternative Dismissal
Pursuant to 12(b)(1),(b3),(b)(6).....

---

Plaintiff  " Pro Se "  Kabil Anton Djenasevic , hereby  " OPPOSES "
any attempt to seek  " SUMMARY JUDGEMENT and or Dismissal pursuant
to  !2b et seq. of Federal Rules of Civil Procedure , since a TRIER
of Fact can  " RULE INFAVOR of PLAINTIFF "   since he supplied numerous
" DOCUMENTS " then  used to support  " ADVERSE DECISION(s) "and where
such agency(s) are not immune from  " PRIVACY ACT CONSEQUENCES " it
is well grounded law in the DC Circuit , Toolasprashad -v- B.O.P. ,
286 F3d. at 578 Notes 12 & 13 (DC Cir,2002) , Hobson -v- Wilson ,
737 F2d. 1 ( Dc Cir.1980)   use of  " COINTEL-PRO " that shows in
[ " TWO CASES " ] , even   " B.O.P. & FBI " whom now use the FBI/SIA
Program to do such  " FALSIFICATION of RECORDS & MEMO's .....

   Such is also warrented to grant Discovery , Bishmullah -v- Gates
503 F3d. 137 (DC Cir.2007) , IN Re Special Investigative Counsel
346 F.Supp.2d. 54-55(DCDC 2007) ..........

FACT PRESENTED TO THE COURT

1.) The Defendant(s) Counsel , [ " REFUSES " ] to turn over
    Discovery , where such was " TIMELY FILED " and served
    via Certified Mail in November of 2007 .....Which now
    collides with " BISHMULLAH -v- GATES ", 503 F3d. 137 (DC Cir.
    2007) , Toolasprashad -v- B.O.P. , 286 F3d. 578 N. 12 & 13
    Hobson -v- Wilson , 737 F2d. 1 (DC Cir. 1980) , Stern -v- FBI
    737 F2d 84 (DC Cir.1980) ..........

2.) The Defendant(s) violate the Core Meaning of § 552a & also what
    is defined in " 40 Fed Reg. 28.948 & 28 ,964 " which requires
    the " AUTHENTICATION " of records via indipendant sources not
    just ones interpitation or want to just abuse his " POWER " and
    support FALSE FINDINGS , but even the employing öther employees
    to manufacture FALSE RECORDS , [ again ] does not make the agency
    immune , SEE EXHIBITS FILED which are FALSIED BY AGENCY EMPLOYEES
    via acts spelled out in earlier case of COINTEL-PRO , and ruled on
    BY Dc Circuit Court of Appeals , Hobson -v- Wilson , 737 F2d.1
    (DC Cir.1980) , Toolasprashad -v- B.O.P. , 286 F3d. 578 N. 12 & 13
    ( DC Cir. 2002) , Bishmüllah -v- Gates , 503 F3d. 137 (DC Cir.2007)
    Therefore [ " REQUIRING " ] EVIDENTIARY HEARING & DISCOVERY
    to ascertain who & what FALSIFIED RECORDS in the case at bar ...

    Also , APPINTMENT of Counsel , to review such records since
    " INTERNATIONAL AGENCIES & ALLEGED CLASSIFIED STATE DEPARTMENT
    REPORTS, ATTORNEY GENERAL REPORTS might be levied by defendants
    that " BISHMULLAH -v- GATES " , 503 F3d. 137 (DC Cir.2007) ...

DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION

Exh. 1
#1
Not part of
Extradition
papers

## CONSENT TO SEARCH

1. **I HAVE BEEN ASKED TO PERMIT SPECIAL AGENTS OF THE DRUG ENFORCEMENT ADMINISTRATION TO SEARCH:** (Describe the person, places or things to be searched.)

SAFE DEPOSIT BOX 3/8G
Bank of America FIRST UNION BANK
IN THE NAME OF HELEN MAKILAS AND ANTONE GIENASE
LOCATED AT 21140 GULF TO BAY
CLEARWATER, FL
Box #168

2. **I HAVE NOT BEEN THREATENED, NOR FORCED IN ANY WAY.**

3. **I FREELY CONSENT TO THIS SEARCH.**

4. I HAVE BEEN ADVISED OF MY RIGHTS UNDER MIRANDA by SA GWEN

_1  3  · 2001_
Date

Signature  Kalil A. Kraja

Witnesses:

SIGNED AT 1ST UNION
GARY RUSS WITNESSED THE PERSON
SIGNING BUT DID NOT WITNESS
GGN. GA

DEA Form — 88
(Oct. 1983)

Previous edition dated 3/76 is Obsolete.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ASO

UNITED STATES OF AMERICA          :
                                  :
        v.                        :          CASE NO. 8:02-Cr-424-T-17MAP
                                  :
KABIL ANTON DJENASEVIC,           :
    a/k/a Anton Genase,           :
    a/k/a Kabil Genase,           :
    a/k/a Kraja Kabil.            :

## AFFIDAVIT IN SUPPORT OF REQUEST FOR EXTRADITION

I Ronald L. Geer, being duly sworn, depose and state:

1.      I am a citizen of the United States of America and reside in the State of

Florida.

2.      I currently am a Special Agent with the Drug Enforcement Administration

("DEA"), assigned to the MIAMI FIELD Division, Tampa District Office.  I have over

24 years of law enforcement experience, with 8½ years as a police officer with the

Miamisburg, Ohio Police Department and 15½ years as a Special Agent for the DEA.

3.      As a Special Agent with the DEA, I am charged with the responsibility of

enforcing criminal laws under Title 21 of the United States Code, which prohibits the

production, transportation, importation, distribution and possession of illegal drugs,

including heroin.

4.      During the past 24 years, I have received extensive training in drug

enforcement techniques and illegal drug operations, to include methods of distribution.

In addition, I have received valuable experience derived from hundreds of criminal

investigations, which I have conducted and/or have participated in.  During the past

AS1

my primary responsibility as a Special Agent for the DEA has been to investigations of organizations and individuals involved in the distribution of legal drugs. Accordingly, I have become familiar with the methods of operation utilized by drug trafficking organizations and individuals involved with drug trafficking.

5. In December 2000, I became involved in an ongoing investigation by the Hillsborough County, Florida Sheriff's Office ("HCSO") and the Tampa, Florida Police Department ("TPD") into the heroin trafficking activities of Richard BARTHEL and others in the Tampa, Florida area. Soon after I joined, the investigation expanded to include BARTHEL'S suppliers, including KABIL ANTON DJENASEVIC, also known as ("a/k/a") Anton Genase, a/k/a Kabil Genase, a/k/a Kabil Kraja. As part of this investigation, I have spoken with officials of the HCSO, TPD and the Pinellas County, Florida Sheriff's Office ("PCSO"), and have reviewed reports prepared by those officials concerning DJENASEVIC, BARTHEL and several other individuals involved in heroin trafficking in the Tampa area. In addition, I personally have conducted extensive interviews of DJENASEVIC, BARTHEL and other individuals involved in the investigation regarding their participation in the activities leading up to the Superseding Indictment charging DJENASEVIC with narcotics and firearms violations. BARTHEL and several other individuals in the Tampa area have been arrested by U.S. law enforcement and are cooperating in this case.

6. I am submitting this affidavit in support of the United States' Government's request to extradite KABIL ANTON DJENASEVIC, a/k/a Anton Genase, a/k/a Kabil Genase, a/k/a Kabil Kraja, to the United States. The information I have gathered during my investigation demonstrates that DJENASEVIC was a major supplier of heroin to

2

distributors in the Tampa area from at least the middle of 2000 through

3, 2001. The following paragraphs set forth the information that I personally

have obtained and that has been provided to me, and other members of U.S. law

enforcement, concerning the illegal activities of the heroin trafficking conspiracy and

DJENASEVIC's involvement in that conspiracy.

7.    From November through December 2000, undercover detectives of the

HCSO made a total of seven (7) purchases of heroin from Richard BARTHEL during

the course of this investigation. On or about December 22, 2000, law enforcement

officials approached Richard BARTHEL concerning his heroin trafficking activities.

BARTHEL agreed to cooperate and assist law enforcement in identifying and arresting

his source of supply. I personally interviewed BARTHEL concerning his source of

supply. BARTHEL at the time only knew his supplier as "LUCKY" and described

"LUCKY" as a while male with a slavic accent. BARTHEL provided me and other

agents with detailed information on "LUCKY", which included information regarding

telephone numbers and a white Nissan-300ZX and a gray BMW driven by "LUCKY".

Through vehicle registration records and information from the United States

Immigration and Naturalization Service I subsequently was able to identify "LUCKY" as

Kabil Anton DJENASEVIC, aka Anton GENASE, aka Kabil GENASE, aka Kabil KRAJA.

8.    'I also determined through computerized criminal history inquiries and

interviews with DJENASEVIC, that DJENASEVIC has a lengthy criminal history with

numerous arrests from 1981 through 2001. DJENASEVIC'S felony convictions include

criminal possession of a weapon and criminal possession of a controlled substance on

June 25, 1991, in the Supreme Court of the State of New York, County of Kings,

No. 0535-91, Docket No. 91K002203; attempted robbery on February 13, in the Supreme Court of the State of New York, County of Kings, Indictment No. CI-14738-92, Docket No. 92K062549; and grand larceny on April 18, 1994, in the Supreme Court of the State of New York, County of Kings, Indictment No. 6418-93. I personally have obtained certified copies of these convictions from the clerk of the Supreme Court of the State of New York, County of Kings.

9.      On December 23, 2000, PCSO Detective Johnnie Jones and BARTHEL purchased 1 ½ ounces of heroin from DJENASEVIC in a parking lot on North Dale Mabry Highway in Tampa, Florida. I, in addition to several law enforcement officers from the HCSO and TPD, personally witnessed this transaction. I observed DJENASEVIC arrive at the transaction driving a gray BMW automobile. DJENASEVIC retrieved the heroin from under the hood of his BMW and handed it to BARTHEL and Detective Jones. Detective Jones and BARTHEL gave DJENASEVIC recorded officially authorized funds in U.S. currency as payment for the heroin.

10.     Once the transaction with Detective Jones and BARTHEL was completed, I, together with other law enforcement officers, followed DJENASEVIC to the Ponce DeLeon Hotel in St Petersburg, Florida. During subsequent statements by DJENASEVIC to me after his arrest in January 2001, he stated that he had used a room in this hotel to store and package heroin for re-sale. On the same day, after BARTHEL and DJENASEVIC had spoken regarding the quantity of heroin that DJENASEVIC had earlier supplied having been short, I, together with other law enforcement officers, followed DJENASEVIC from the Ponce DeLeon Hotel back to Tampa, Florida where DJENASEVIC delivered additional heroin to BARTHEL and

4

I have personally reviewed the laboratory analysis of the substances by DJENASEVIC on December 23, 2000, completed by chemists at the Florida Department of Law Enforcement ("FDLE"). The report reflects that the substances contain heroin.

11.    On December 28, 2000, Detective Jones and BARTHEL purchased approximately 1½ ounces of heroin from DJENASEVIC at the Bennigan's Restaurant on Highway 60 in Clearwater, Florida. I personally observed DJENASEVIC arrive in his gray BMW. BARTHEL and Detective Jones again gave DJENASEVIC recorded officially authorized funds in U.S. currency as payment for the heroin. DJENASEVIC completed the transaction and drove directly to 851 Bayway Blvd, Clearwater, Florida. Additional investigation by me revealed that DJENASEVIC at the time had lived at 851 Bayway Blvd, Clearwater, Florida with his girlfriend Helen MAFILAS. I have personally reviewed the laboratory analysis of the substances distributed by DJENASEVIC on December 28, 2000, completed by chemists at the Florida Department of Law Enforcement ("FDLE"). The report reflects that the substances contain heroin.

12.    On January 3, 2001, I, together with other officers from the HCSO, TPD and PCSO, arrested DJENASEVIC in the parking lot of Bennigan's Restaurant located on Highway 60, Clearwater, Florida. BARTHEL and Detective Jones just previously had arranged to purchase ½ ounce of heroin from DJENASEVIC at that location. DJENASEVIC had arrived in his BMW to deliver the heroin. Law enforcement officers seized approximately 16.1 grams of heroin from DJENASEVIC's person and another 10.3 grams of heroin from inside the BMW. DJENASEVIC subsequently was charged

5

ASS

and Hillsborough Counties of Florida with violating State of Florida drug laws, to wit trafficking in heroin.

13.    After I advised DJENASEVIC of his United States Constitutional rights to remain silent and have representation by an attorney, DJENASEVIC agreed to be interviewed by me without an attorney, answer questions concerning his heroin trafficking activities, and cooperate with law enforcement.

*Key Life* & *Did not Consent + Sign nothing*

14.    DJENASEVIC signed a written consent to search the condominium in ? which he resided with his girlfriend at #908, 851 Bayway Blvd, Clearwater, Florida. DJENASEVIC also consented to a search of the room he had rented at the Ponce DeLeon Hotel in St Petersburg, Florida. No drug evidence was recovered from the hotel room, although, a copy of the room billing was obtained by me, reflected that there were no incoming or outgoing telephone calls. DJENASEVIC told me that he had used the Ponce DeLeon Hotel to hide and process heroin for distribution. *Lie*

15.    Law enforcement officers of the DEA, HCSO, TPD and PCSO conducted a search of 851 Bayway Blvd #908, Clearwater, Florida. Several documents were seized in addition to two (2) small caliber handguns, that is, a Taurus, Model PT11, 9mm handgun, Serial Number TSC31497, and a Jennings, Model J22, .22 caliber handgun, Serial Number 713971, and approximately $20,000 in U.S. currency. The currency and the firearms were hidden above ceiling tiles in the bathroom. Over 207.02 grams of heroin were seized from above the ceiling tiles in the kitchen. DJENASEVIC told me that the guns and heroin found in the ceilings of the condominium had belonged to him. DJENASEVIC told me that the heroin seized in his possession at the *Lie* Bennigan's Restaurant and the 207.02 grams of heroin seized from above the kitchen

6

eiling at his Bayway Blvd condominium, had been part of a 1/2 kilogram of heroin that he and another individual had obtained in late December 2000, from a heroin source of supply in Chicago. I have personally reviewed the laboratory analysis of the substances possessed by DJENASEVIC on January 3, 2001, completed by chemists at the Florida Department of Law Enforcement ("FDLE"). The report reflects that the substances contain heroin.  — *Lab Report!? where*

16.    DJENASEVIC also admitted to me that he had been selling heroin in the Tampa area for several months. DJENASEVIC described individuals to whom he sold heroin, including BARTHEL. DJENASEVIC stated that he had supplied BARTHEL with heroin for at least 5 to 6 months. DJENASEVIC also identified sources of heroin in New York and Chicago from whom he and his cousin and partner, Hjuden DJENASHEVICH, a/k/a "Dino", had purchased in excess of a kilogram of heroin for distribution in the Tampa area. DJENASEVIC told me that his sources in Chicago and New York were capable of providing kilogram quantities of heroin.

17.    DJENASEVIC explained to me that he had used a First Union Bank safe deposit box in Clearwater, Florida. DJENASEVIC told me that there was approximately $46,000 in U.S. currency in the safe deposit box that was, in part, the proceeds from a pizzeria business venture he had had with relatives in New York and the rest he had inherited from his father. DJENASEVIC claimed there was no money from heroin sales in the safe deposit box. I met with First Union Bank officials and learned that there was a safe deposit box held in the name of Anton GENASE and Helen MAFILAS located at the First Union Bank branch on Gulf to Bay Blvd, Clearwater, Florida. Anton GENASE is one of the alias's used by DJENASEVIC.

7

18.     On January 4, 2001, I and other law enforcement officers transported

DJENASEVIC to the First Union Bank on Gulf to Bay Blvd, Clearwater, Florida.

DJENASEVIC signed a consent to search form authorizing me to enter safe deposit

box #168.  While I was speaking with bank officials, Helen MAFILAS entered the bank

and expressed concerned that DJENASEVIC possibly had taken money from her    *Lie*

accounts without authorization.  Helen MAFILAS told me that she knew nothing about a

safe deposit box and that she had had no joint safe deposit boxes with DJENASEVIC.

DJENASEVIC confirmed this explaining that he had placed Helen MAFILAS' name on

the safe deposit box account but that she had had no knowledge or access to the box.    *Lie*

19.     Safe deposit box #168 contained $45,920 in U.S. currency.  The currency

in the safe deposit box was compared to official recorded funds used in previous heroin

purchases made during this investigation.  Serial numbers recorded from the official

funds used to purchase heroin from DJENASEVIC and BARTHEL were found amongst

the currency seized from the safe deposit box.    *not possible. Sign in card*
*does not reflect dates*

20.     After his arrest, DJENASEVIC continued to provide detailed information to

me concerning his heroin trafficking activities.  DJENASEVIC identified several

customers who had received ounce quantities of heroin from him as well as individuals

in New York and Chicago who had supplied and assisted in providing him with multiple

ounce to 1/2 kilogram quantities of heroin.    *Lies*

21.     Through my participation in the investigation and  arrest of DJENASEVIC,

my interviews of DJENASEVIC, and information that I received from the United States

Immigration and Naturalization Service, I have determined that DJENASEVIC is a

citizen of Yugoslavia, born on July 11, 1963 (with an alternative birth date of June 25,

962) in Kraja, Albania. He is a male Caucasian, with a height of 6 feet, 2 inches, a weight of approximately 200 pounds, brown eyes and black hair. Attached as Attachment A is a recent photograph of DJENASEVIC.

22.    In February 2001, DJENASEVIC was released on bond from Pinellas County Jail. DJENASEVIC and Helen MAFILAS subsequently married in Hillsborough County, Florida. I remained in contact with DJENASEVIC who stated that he was going to further his cooperation with law enforcement. In late February 2001, however, DJENASEVIC'S attorney contacted me and stated that he believed that DJENASEVIC had fled the area to avoid prosecution. Since that date, I have been in contact with several individuals attempting to locate DJENASEVIC. I have received information indicating that DJENASEVIC was living and traveling under an alias in an attempt to elude law enforcement.

23.    On August 1, 2001, I received information from a reliable source that DJENASEVIC had fled the United States with his wife Helen MAFILAS-DJENASEVIC. On October 1, 2002, I received information that DJENASEVIC and Helen MAFILAS-DJENASEVIC were in South Africa. I contacted the Pretoria, South Africa Office of the DEA and spoke to Country Attaché Larry Frye, a DEA Special Agent. Special Agent Frye and I both verified that DJENASEVIC had traveled to South Africa on a tourist visa and was staying with the parents of his wife Helen MAFILAS-DJENASEVIC at 10 Banksia Ave, Oriel, Bedfordview, South Africa.

24.    On October 21, 2002, I received information that DJENASEVIC had made reservations to fly from Johannasburg International Airport to Yugoslavia on or about Tuesday October 29, 2002.

9

25.    On October 23, 2002, a federal grand jury in the Middle District of

Tampa Division, returned a four-count Indictment charging DJENASEVIC with

conspiracy to possess with intent to distribute 100 grams or more of heroin, a

substance in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(B)(i);

and possession with intent to distribute heroin, a controlled substance, in violation of

Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B)(i), and 841(b)(1)(C).

26.    On October 29, 2002, DJENASEVIC was arrested pursuant to a request

for his provisional arrest submitted by the United States on October 28, 2002, by

officials of the South African Polices Services officials at the Johannesburg International

in Johannesburg, South Africa, as he was attempting to board a flight to Yugoslavia.

27.    On November 19, 2002, a federal grand jury in the Middle District of

Florida, Tampa Division, returned a five-count Superseding Indictment charging

DJENASEVIC with conspiracy to possess with intent to distribute and to distribute one

kilogram or more of heroin, a controlled substance, from an unknown date, but at least

beginning in mid-2000, through on or about January 3, 2001, in violation of Title 21,

United States Code, Sections 846 and 841(b)(1)(A)(i) (Count One); distribution of

heroin, a controlled substance, on or about December 23, 2000, and December 28,

2000, in violation of Title 21, United States Code, Sections 841(a)(1)and 841(b)(1)(C)

(Counts Two and Three); possession with intent to distribute 100 grams or more of

heroin, a controlled substance, on or about January 3, 2001, in violation of Title 21,

United States Code, Sections 841(a)(1) and  841(b)(1)(B)(i); and being a felon

in possession of firearms on or about January 3, 2001, in violation of Title 18,

United States Code, Section 922(g)(1) (Count Five).

10

of the foregoing facts are true to the best of my knowledge and belief.

Ronald L. Geer
Special Agent, DEA
Tampa, Florida

Signed and sworn to before me this 25th day of November, 2002, at the Sam A.

Gibbons United States Courthouse, Tampa, Florida 33602-4511.

The Honorable Mark A. Pizzo
United States Magistrate Judge

N:\cdavis\KJMPeluso\Djenasevic_2002R02551\affidavitGEER.wpd

11

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CASE NO. 8:02-Cr-424-T-17MAP |
| | : | |
| KABIL ANTON DJENASEVIC, | : | |
| a/k/a Anton Genase, | : | |
| a/k/a Kabil Genase, | : | |
| a/k/a Kraja Kabil. | : | |

## AFFIDAVIT IN SUPPORT OF REQUEST FOR EXTRADITION

I, KATHY J.M. PELUSO, being duly sworn, state that:

1.      I am a citizen of the United States of America and a resident of the State of Florida.

2.      I received a Doctor of Jurisprudence from South Texas College of Law in Houston, Texas in May 1982. I was admitted to the Bar of the State of Texas on November 5, 1982. From July 1, 1991 to the present, I have been employed by the United States Department of Justice as an Assistant United States Attorney for the Middle District of Florida. I currently am assigned to the Narcotics Section. As a federal prosecutor, my duties are to prosecute persons charged with criminal violations of the laws of the United States. During my practice as an Assistant United States Attorney, I have become knowledgeable about the criminal laws and procedures of the United States. As an Assistant U.S. Attorney for the Middle District of Florida, I am responsible for the preparation and prosecution of criminal cases. Based upon my training and experience, I am an expert in the criminal laws and procedures of the United States.

3.    In the course of my duties, I have become familiar with the charges and evidence in the case of <u>United States v. KABIL ANTON DJENASEVIC,(also known as Anton Genase, Kabil Genase, and Kabil Kraja)</u>, Case No. 8:02-Cr-424-T-17MAP. The charges in this case follow an investigation by members of the Drug Enforcement Administration ("DEA"), the Hillsborough County, Florida Sheriff's Office ("HCSO"), the Tampa, Florida Police Department ("TPD"), and the Pinellas County, Florida Sheriff's Office ("PCSO"), which revealed that from an unknown date, but at least beginning in the middle of 2000, to on or about January 3, 2001, DJENASEVIC, a citizen of Yugoslavia, and others known and unknown, transported heroin from New York, New York and Chicago, Illinois to the Tampa, Florida area and distributed it.

## A. PROCEDURAL HISTORY OF THE CASE

### I. The Charging Process

4.    Under the federal law of the United States, a criminal prosecution is commenced when a grand jury files an indictment. Institutionally, a grand jury, though an arm of the court, is an independent body composed of private citizens -- not less than 16 and not more than 23 people -- whom the United States District Court selects at random from the residents of the judicial district in which the court resides. The purpose of the grand jury is to review the evidence of crimes presented to it by United States law enforcement authorities. After independently reviewing this evidence, each member of the grand jury must determine whether there is probable cause to believe that a crime has been committed and that a particular person committed that crime. If at least 12 jurors find that the evidence they have reviewed provides probable

2

...use to believe that a particular person committed the crime, the grand jury may return an indictment. An indictment is a formal written accusation that charges the particular person, now a defendant, with a crime, identifies the specific laws that the defendant is accused of violating, and specifies the date and place where the charged crime occurred.

5.    The grand jury initiates the criminal prosecution when it files the indictment with the United States District Court. Thereafter, the clerk of the court, at the direction of a United States District Judge or Magistrate Judge, normally issues a warrant for the defendant's arrest.

6.    If additional evidence is presented to a grand jury as to a defendant against whom an indictment has already been returned, the grand jury may return a superseding indictment using the same procedure as is used with an original indictment. In such instance, the superseding indictment may take the place of the previous indictment. If still more evidence is presented to a grand jury after a superseding indictment has been returned, the grand jury may return a second superseding indictment that takes the place of the earlier superseding indictment. A warrant for the arrest of the defendant may issue from a superseding indictment, or second superseding indictment, by using the same procedure as is used to issue a warrant for arrest on an original indictment.

7.    In addition to imprisonment and a criminal fine, United States law provides for the seizure and forfeiture of property of the defendant that constitutes the proceeds of narcotics trafficking or that facilitates such trafficking. A criminal forfeiture may be alleged in an indictment, along with the narcotics-related crimes, only if the

3

grand jury finds probable cause to believe that the property is forfeitable. Upon a showing of probable cause, a United States District Court Judge or Magistrate Judge may issue a seizure warrant for the seizure of the property.

## B. THE CHARGES AND PERTINENT UNITED STATES LAW

8.    On October 23, 2002, a federal grand jury sitting in the Middle District of Florida, Tampa Division, returned a four count indictment charging DJENASEVIC with one count of conspiracy to distribute and possess with intent to distribute 100 grams or more of heroin from an unknown date to on or about January 3, 2001, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(B)(i) (Count One), and three counts of possession with intent to distribute heroin on December 23, 2000, December 28, 2000, and January 3, 2001, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(i) and (C)(Counts Two, Three and Four).  Under United States Law, heroin is a Schedule I controlled substance under Title 21 U.S.C. § 812.

9.    On November 19, 2002, the same federal grand jury that returned the original Indictment returned a five-count Superseding Indictment charging DJENASEVIC with conspiracy to possess with intent to distribute and to distribute one kilogram or more of heroin, a controlled substance, from an unknown date, but at least beginning in mid-2000, through on or about January 3, 2001, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A)(i)(Count One); distribution of heroin, a controlled substance, on or about December 23, 2000, and December 28, 2000, in violation of Title 21, United States Code, Sections 841(a)(1)and 841(b)(1)(C)(Counts Two and Three); possession with intent to distribute 100 grams or more of heroin, a controlled substance, on or about January 3, 2001, in violation of

4

A 8

Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(i); and being a felon in possession of firearms on or about January 3, 2001, in violation of Title 18, United States Code, Section 922(g)(1) (Count Five). The grand jury filed this Superseding Indictment with the United States District Court for the Middle District of Florida.

10.     It is the practice of the United States District Court for the Middle District of Florida to retain the original superseding indictment and file it with the records of the court. Therefore, I have obtained a copy of the Superseding Indictment, certified as true and accurate, from the clerk of the court and attached it to this affidavit as exhibit A.

11.     On November 19, 2002, based on the Superseding Indictment filed by the grand jury, and with the approval of the United States District Court for the Middle District of Florida, a deputy clerk of the court signed a warrant of arrest for DJENASEVIC in the name of Sheryl L. Loesch, the clerk of the court. Pursuant to Rule 9 of the Federal Rules of Criminal Procedure, the clerk of the court is the authority competent to sign arrest warrants and deliver them for execution to law enforcement authorities competent to make arrests. A copy of Rule 9 is attached to this affidavit as Exhibit B. This function — to sign and deliver arrest warrants — also resides in, and is appropriately, customarily, and lawfully exercised by, deputy clerks of the court. In fact, in nearly every case in this district, a deputy clerk, and not the appointed clerk, signs and delivers arrest warrants. It is the practice of the United States District Court for the Middle District of Florida to retain the original arrest warrant and file it with the records of the court. Therefore, I have obtained a copy of the arrest warrant, certified as true and accurate, from the clerk of the court and attached it to this affidavit as Exhibit C.

5

12.  The Superseding Indictment charges in five counts that DJENASEVIC and others committed the following offenses:

Count 1:  conspiracy to possess with intent to distribute and to distribute one kilogram or more of mixture or substance containing a detectable amount of heroin, a controlled substance, contrary to the provisions of 21 U.S.C. § 841(a)(1), in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(i);

Counts 2-3:  distribution of a mixture or substance containing a detectable amount of heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C);

Count 4:  possession with the intent to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(i); and

Count 5:  having been convicted of a crime punishable by imprisonment exceeding one year, possessing firearms, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

Because DJENASEVIC has a prior felony drug conviction, Count 1 carries a maximum penalty of life imprisonment, a mandatory minimum sentence of 20 years imprisonment, and a maximum fine of the greater of $8,000,000, or twice the gross pecuniary gain derived from the offense.  Counts 2 and 3 each carry a maximum penalty of 30 years' imprisonment and a maximum fine of the greater of $2,000,000, or twice the gross pecuniary gain derived from the offense.  Count 4 carries a maximum penalty of life imprisonment, a mandatory minimum sentence of 10 years' imprisonment, and a maximum fine of the greater of $4,000,000, or twice the gross pecuniary gain derived from the offense.  Count 5 carries a maximum penalty of 10 years' imprisonment and a maximum fine of $250,000.  The United States requests the extradition of DJENASEVIC for all of these offenses.

13.    Each count charges a separate offense.  Each offense is punishable under a statute that (1) was the duly enacted law of the United States at the

6

time the offense was committed, (2) was the duly enacted law of the United States at the time the Superseding Indictment was filed, and (3) is currently in effect. As stated above, each offense is punishable under United States law by more that one year of imprisonment. Copies of the pertinent sections of these statutes are attached as Exhibit D.

## C. ELEMENTS OF THE CHARGED OFFENSES

Count 1.

14.    Count 1 charges DJENASEVIC with conspiracy to commit a substantive offenses against the United States, specifically, to possess with intent to distribute and to distribute heroin, contrary to 21 U.S.C. § 841(a)(1), all in violation of Title 21, United States Code, § 846. Conspiracy to to possess with intent to distribute and to distribute heroin is a conspiracy for which the United States may extradite under its laws.

15.    Under United States law, a conspiracy is simply an agreement to commit one or more criminal offenses, in this instance to possess with intent to distribute and to distribute heroin. The agreement on which the conspiracy is based need not be written or even verbal. It may be simply a tacit understanding by two or more persons to do something illegal. The conspirators enter into a partnership for a criminal purpose in which each member or participant becomes a partner or agent of every other member. A person may become a member of a conspiracy without full knowledge of all the details of the unlawful scheme or the identities of all the other members of the conspiracy. If a person has an understanding of the unlawful nature of a plan and knowingly and willfully agrees to it, joining in the plan, that is enough to

7

convict him for conspiracy even though he did not participate before and may play only a minor part. In fact, a conspirator can be held criminally responsible for all reasonably foreseeable actions undertaken by other conspirators in furtherance of the criminal partnership. Moreover, because of this partnership, statements made by a conspirator in the course of and while he is a member of the criminal conspiracy are admissible in evidence not only against that conspirator, but also against all other members of the conspiracy. This is so because, as stated earlier, a conspirator acts as an agent or representative of the other conspirators when he is acting in furtherance of their illegal scheme. Therefore, statements of conspirators made in furtherance of the conspiracy may be deemed to be the statements of all conspirators.

16.     Under United States law, the crime of conspiracy is an independent offense, separate and distinct from the commission of any specific "substantive crimes." Consequently, a conspirator can be found guilty of a crime of conspiracy to commit an offense even where the substantive crime that was the purpose of the conspiracy is not committed. The Congress of the United States has deemed it appropriate to make conspiracy, standing alone, a separate crime, even if the conspiracy is not successful, because collective criminal planning poses a greater threat to the public safety and welfare than individual conduct and increases the likelihood of success of a particular criminal venture.

17.     To satisfy its burden of proof and convict DJENASEVIC on Count 1, the government, at trial, must establish beyond a reasonable doubt each of the following essential elements: (1) that two or more persons entered an agreement to commit the underlying offense of (i.e., possession with intent to distribute and to

8

distribute heroin); and (2) that DJENASEVIC knowingly became a member of the conspiracy to commit the underlying offense.

Counts 2 and 3.

18.    The first substantive offense is distribution of heroin. Counts 2 and 3 charge DJENASEVIC with violations of 21 U.S.C. § 841(a)(1), which makes it an offense against the United States to distribute heroin. To satisfy its burden of proof and convict DJENASEVIC on these counts, the government, at trial, must establish beyond a reasonable doubt, with respect to each count, each of the following two essential elements: (1) that DJENASEVIC distributed heroin; and (2) that DJENASEVIC did so knowingly and willfully. To "distribute" simply means to deliver or transfer possession of a "controlled substance" to another person, with or without any financial interest in the transaction.

Count 4.

19.    The second substantive offense is possession with the intent to distribute heroin in the United States. Count 4 charges DJENASEVIC with violating 21 U.S.C. § 841(a)(1), which also makes it an offense against the United States to possess heroin with the intent to distribute it. To satisfy its burden of proof and convict DJENASEVIC on this count, the government, at trial, must establish beyond a reasonable doubt each of the following two essential elements: (1) that DJENASEVIC possessed heroin; and (2) that DJENASEVIC did so with the intent to distribute it.

Count 5.

20.    The last offense charged in the Superseding Indictment is being a felon in possession of firearms. Count five charges DJENASEVIC with violating

9

18 U.S.C. § 922(g)(1) which makes it an offense against the United States for anyone, having been convicted of a felony, that is, a crime punishable by a term of imprisonment exceeding one year, to possess firearms, which firearms had been shipped in interstate commerce. To satisfy its burden of proof and convict DJENASEVIC on this count, the government, at trial, must establish beyond a reasonable doubt each of the following two essential elements: (1) that DJENASEVIC knowingly possessed firearms in or affecting interstate commerce, as charged; and (2) that before DJENASEVIC possessed the firearms, DJENASEVIC had been convicted in a court of a crime punishable by imprisonment for a term in excess of one year, that is, a felony offense. The term "firearm" means any weapon which is designed to, or may readily be converted to, expel a projectile by the action of an explosive; and the term includes the frame or receiver of any such weapon, or any firearm muffler or firearm silencer. The term "interstate commerce" includes the movement of a firearm between any place in one state and any place in another state. It is not necessary for the Government to prove that DJENASEVIC knew that the firearms had moved in interstate commerce before the Defendant possessed it, only that it had made such movement.

## D. STATUTE OF LIMITATIONS

21.    The statute of limitations applicable to the offenses charged in each count is 18, U.S.C. § 3282, which allows prosecution to commence within five (5) years after the offense is committed. Once an Indictment has been filed in a United States District Court, as with these charges against DJENASEVIC, the statute of limitations is tolled and no longer runs. This prevents a criminal from escaping justice and eluding law enforcement and remaining a fugitive for an extended period of time. A

copy of the statute is attached as Exhibit E. The superseding indictment is dated November 19, 2002, and Count One charges an offense that continued until January 3, 2001; Count Two charges an offense that occurred on December 23, 2000; Count Three charges an offense that occurred on December 28, 2000; and Counts Four and Five charge offenses that occurred on January 3, 2001. Therefore, the charges were filed within the prescribed time and the statute of limitations is tolled.

E. SUMMARY OF THE FACTS OF THE CASE

22.    As reflected in the affidavits of DEA Special Agent Ronald L. Geer (attached at Exhibit F), the United States has obtained evidence showing the following facts:

23.    Between at least the middle of 2000 and January 3, 2001, the DJENASEVIC and co-conspirators transported multiple ounce and ½ kilogram quantities of heroin from in and around New York, New York and Chicago, Illinois to the Tampa, Florida area and sold the heroin to various local distributors for further distribution in and around the Tampa area. Two of these local distributors have been arrested and at least one of them agreed to cooperate with U.S. law enforcement against DJENASEVIC and others. Pursuant to his cooperation, this cooperating witness ("CI"), together with an undercover detective, purchased heroin on two occasions, December 23, 2000, and December 28, 2000, from DJENASEVIC, and arranged to purchase heroin from DJENASEVIC on a third occasion, January 3, 2001. U.S. law enforcement officers arrested DJENASEVIC when he arrived at the arranged location on January 3, 2001 and searched DJENASEVIC's person and his vehicle, finding quantities of heroin in both places. With DJENASEVIC's consent, law

11

nforcement officers also searched DJENASEVIC's residence and found over 200 grams of heroin, two firearms, and $20,000 in U.S. Currency. Also with DJENASEVIC's consent, they searched a safe deposit box that DJENASEVIC had rented and found another $45,920 in U. S. currency. During a post-arrest interview, and after having been advised of his rights under the United States' Constitution, DJENASEVIC stated that the firearms found in his residence had belonged to him. At the time of his arrest on January 3, 2001, DJENASEVIC had been convicted of at least two felony crimes. Further, because both firearms had been manufactured outside the State of Florida, they had affected interstate commerce.

### F.  DESCRIPTION OF DJENASEVIC

24.    DJENASEVIC is a citizen of Yugoslavia, born on July 11, 1963 (with an alternative birth date of June 25, 1962) in Kraja, Albania. He is described as a male Caucasian, with a height of 6 feet, 2 inches, a weight of 200 pounds, brown eyes and black hair. Attached as Exhibit F is the original affidavit of Special Agent Ronald Geer, DEA, providing detailed identification information as well as a recent photograph of DJENASEVIC.

### G.  CONCLUSION

25.    I personally reviewed the Exhibits attached to this affidavit and attest that the evidence indicated herein establishes that KABIL ANTON DJENASEVIC is guilty of the offenses for which his extradition is sought.

Paul I. Perez
United States Attorney

KATHY J. PELUSO
Assistant United States Attorney
Narcotics Section

12

Signed and sworn to before me this 25th day of November, 2002, at the

Sam A. Gibbons United States Courthouse, Tampa, Florida  33602-4511.


The Honorable Mark A. Pizzo
United States Magistrate Judge

Attachment A





PINELLAS COUNTY
SHERIFF'S OFFICE

SUSPECT DATABASE
Name:  KRAJA
        KABIL
DOB:  06 / 25 / 62
Race:  MALE
Sex:   WHITE
Hgt/Wgt: 6' 02 "   230  lbs.
Eyes  BROWN  Hair: BROWN
Image#:  1079895
Type:  BOOKING RECORD
Picture Date/Time:
       01 / 03 / 01     19:48

I, ANSO VAN DEVENTER, state under oath in English.

1

I am a Superintendent in the South African Police Service, stationed at Interpol Pretoria, telephone number (012) 339 1893, residing in Pretoria, cellular number 082 905 0374.

2

I am responsible for case no 74/10/2002 whereby a certain Kabil Anton Djenasevic is being sought for extradition by the United State of America on charges of conspiracy to traffic in narcotics and trafficking in narcotics.

3

A copy of the request by the American authorities for provisional arrest, together with the United States warrant of arrest and Grand Jury Indictment are attached hereto as Annexure A.

4

Copies of a photograph and fingerprints of the fugitive are included in Annexure A.

5

The wanted person is believed to be in Kempton Park.

6

I hereby wish to apply for a warrant of arrest according to Section 5(1)(b) of the Extradition Act 67 of 1962.

7

I know and understand the contents of this statement.
I have got no objection in taking the prescribed oath.
I consider the prescribed oath to be binding on my conscience.

Date: ...2002-10-31

A Van Deventer



200 West Forsyth Street, Room 700
Jacksonville, Florida 32201
904/232-2682
904/232-2620 (Fax)

**U.S. Department of Justice**
*United States Attorney*
*Middle District of Florida*

*2110 First Street, Suite 3-137*
*Fort Myers, Florida 33901*
*941/461-2200*
*941/461-2219 (fax)*

*80 North Hughey Avenue, Room 201*
*Orlando, Florida 32801*
*407/648-7500*
*407/648-7643 (Fax)*

*Reply to:* **Tampa, FL**

KJMP/cld

November 26, 2002

Jason L. Carter
Trial Attorney
Office of International Affairs
1301 New York Avenue, 8th Floor
Washington, D.C. 20005

Re: <u>United States of America v. Kabil Anton Djenasevic</u>
    Case No. 8:02-Cr-424-T-17MAP

### Request for Extradition

Dear Mr. Carter:

Enclosed is one original extradition package and four (4) exact copies as you requested.

If you have any questions or if there is anything else you need, please feel free to call me.

Thank you for all of your assistance. It has been a pleasure working with you.

Sincerely,

PAUL I. PEREZ
United States Attorney

By: KATHRYN M. PELUSO
    Assistant United States Attorney



## WARRANT OF ARREST ISSUED IN TERMS OF SECTION 5(1) (b) OF THE EXTRADITION ACT 67 OF 1962

WHEREAS I am in receipt of information under oath that a warrant of arrest has been issued in the United States of America for **Kabil Anton Djenasevic** and that he is wanted for drug trafficking offences. Information further indicates that his provisional arrest is requested pending receipt of the formal request documentation for the said offences in the country.

AND WHEREAS I am also of the opinion, based upon the information placed before me, that the issuing of the warrant of arrest in respect of **Kabil Anton Djenasevic** would have been justified on charges of conspiracy to traffic in narcotics and trafficking in narcotics, had it been alleged that he had committed the said offences in the Republic of South Africa, and therefore he is a person liable to be surrendered to the United States of America.

You are hereby directed to arrest the said of **Kabil Anton Djenasevic** and bring him before a lower court in accordance with the provision of section 50 of the Criminal Procedure Act, 1977 and section 9 of the Extradition Act, 1962.

Given under my hand at Kempton Park this the 31st day of October 2002

MAGISTRATE: KEMPTON PARK

LANDDROS

2002 -10- 3 1

KEMPTON PARK

MAGIST



A 3

## <u>CERTIFICATION</u>

I, Ernestine Gilpin, Associate Director, Office of International Affairs, Criminal Division, United States Department of Justice, do hereby certify that attached hereto and prepared in support of the United States request for extradition of KABIL ANTON DJENASEVIC from South Africa is the Affidavit of Kathy J. M. Peluso, Assistant United States Attorney, United States District Court, Middle District of Florida, Tampa Division, sworn to on November 25, 2002, before Mark A. Pizzo, United States Magistrate Judge, United States District Court, Middle District of Florida, Tampa Division.

True copies of the original documents are maintained in the official files of the United States Department of Justice in Washington, D.C.

Dec 4, 2002
_____
Date

Ernestine Gilpin
_____
Ernestine Gilpin
Associate Director
Office of International Affairs
Criminal Division
U.S. Department of Justice

# United States
# Department of Justice



Washington, D.C., _____ DECEMBER 4, _____ , 20 __02__

To all whom these presents shall come, Greeting:

_____ That _____ ERNESTINE GILPIN _____ whose name is signed

to the accompanying paper, is now, and was at the time of signing the same,

ASSOCIATE DIRECTOR, OFFICE OF INTERNATIONAL AFFAIRS, CRIMINAL DIVISION,

U.S. DEPARTMENT OF JUSTICE

_____ duly commissioned and qualified.

In witness whereof, I, _____ JOHN ASHCROFT

> Attorney General of the United States,
> have hereunto caused the Seal of the
> Department of Justice to be affixed and
> my name to be attested by the Director/
> Deputy Director, Office of International
> Affairs, Criminal Division, of the said
> Department on the day and year first
> above written.

**Attorney General**

By _____ Lisa O'Burnett _____

Director/Deputy Director, Office of International Affairs,
Criminal Division

CRM-181
APR 98

SAB 2517/11/2002
SAP 14/300/10/2002

**SERIAL NUMBER**

**A** 799316

English

# NOTICE OF RIGHTS IN TERMS OF THE CONSTITUTION
## (SECTION 35 OF ACT NO. 108 OF 1996)

(1)   You are being detained for the following reason:

_Extradition_

(2)   As a person who is detained you have the following right;

(a)   you have the right to consult with a legal practitioner of your choice or, should you so prefer, to apply to the Legal Aid Board to be provided by the State with the services of a legal practitioner;

(b)   you have the right to challenge the lawfulness of your detention in person before a court of law and to be released if such detention is unlawful;

(c)   you have the right to be detained under condition consonant with human dignity, which shall include at least the provision of adequate accommodation, nutrition, reading material and medical treatment at state expense; and

(d)   you have the right to be given the opportunity to communicate with, and be visited by, your spouse or partner, next-of-kin, religious counsellor and a medical practitioner of your choice.

(3)   As a person arrested for the alleged commission of an offence, you have the following rights:

(a)   you have the right to remain silent and anything you say may be recorded and may be used as evidence against you;

(b)   you are not compelled to make a confession or admission which could be used in evidence against you;

(c)   you have the right to be brought before a court as soon as reasonably possible but not later than 48 hours after your arrest or the end of the first court day after the expiry of the 48 hours, if the 48 hours expire outside ordinary court hours or on a day which is not an ordinary court day;

(d)   you have the right, at the first court appearance after your arrest, to be informed of the reason for your continued detention, or to be released; and

(e)   you have the right to be released from detention if the interests of justice permit, subject to reasonable conditions.

(4)   **You can exercise all the abovementioned rights at any stage during your detention.**

## CERTIFICATION BY DETAINEE

I, _Kabil Djenasevic_ (name of detainee) hereby certify that I have been informed in _English_ (state language) of my rights in terms of the Constitution as set out above by _Capt TE Ntjana_ (name of person who informed the detainee) and that I understand the contents thereof.

DATE: _2002/10/29_     TIME: _20:30_     PLACE: _Pretoria_
(Informed)                (Informed)              (Informed)

_____          _____ Capt.
SIGNATURE/THUMBPRINT OF DETAINEE        SIGNATURE OF PERSON WHO INFORMED THE DETAINEE

# CERTIFICATE BY THIRD PERSON AS WITNESS (if required)

I, _NO 0172163-1 D/Insp SC Mabaso_ (name of member) hereby certify that _Kabil Djenasevic_ (name of detainee) has been informed in my presence in _English_ (state language) of his/her rights in terms of the Constitution as set out above by _Capt TE Ntjana_ (name of person who informed the detainee) and that the contents thereof has been explained to him/her but that he/she refuses to sign the above certificate.

DATE: _2002/10/29_     TIME: _20:30_     PLACE: _Pretoria_
(Informed)                (Informed)              (Informed)

_____
SIGNATURE OF THIRD PERSON

Exhibit # 10 (k)

F-5140 0.5 INMATE REQUEST TO STAFF CDFRM
IP 98

.S. DEPARTMENT OF JUSTICE                    FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Staff Member) | DATE: 7-28-06 |
|---|---|
| Mr. Troutman, Unit Manager | |
| FROM: Kabil Anton Djenasevic | REGISTER NO.: 41112-018 |
| WORK ASSIGNMENT: FD-3 | UNIT: 1B |

SUBJECT: (briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.)

Mr. Troutman, will you please inform me whether

or not the United States has a Bilateral

Treaty and transfer agreement with Montenegro?

The answer may lie in BOP P.S. 5140.34. If

there is such an agreement, what date did

it become effective?

(Do not write below this line)

DISPOSITION:

There is no agreement between the U.S. and Montenegro.

8/2/06

_____, CASE MANAGER
AUTHORIZED BY THE ACT OF JULY 7,
1955, AS AMENDED TO ADMINISTER
OATHS (18 USC 4004).

C. Whitmer, Case Manager, Unit 1B

_____          _____
Signature Staff Member             Date
CliWh                              7/31/06

Record Copy - File; Copy - Inmate          This form replaces BP-148.070 dated Oct 86
(This form may be replicated via WP)        and BP-S148.070 7   94

*Exhibit NFU(2)*

BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98
**U.S. DEPARTMENT OF JUSTICE**                    FEDERAL BUREAU OF PRISONS

| TO:(Name and Title of Staff Member) | DATE: |
|---|---|
| Mr. Troutman / Unit Manager | 12-7-07 |
| FROM: Djenasevic Vasil Anton | REGISTER NO.: 41112-018 |
| WORK ASSIGNMENT: EO·3 | UNIT: 1-B |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.)

(1)  How do al go about applying for a "Bilateral" Prisoner treaty transfer with the Country of Montenegro?!

(2) Does the United States and Montenegro in fact, have a "Bilateral" treaty for Prisoner transfer?

I await your reply to Questions #(1)+(2) please give me the facts and "Bottom line." Thank you
Djenasevic/V.Anton

(Do not write below this line)

DISPOSITION:

Per Program Statement 5140.34, Montenegro is not on the list of eligible countries for treaty transfer.

| Signature Staff Member | Date |
|---|---|
| Cli White | 12/12/07 |

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

. This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94



Exhibit #10(c)

BP-S148.055  INMATE REQUEST TO STAFF MEMBER                    FEDERAL BUREAU OF PRISONS
SEP 98
U.S. DEPARTMENT OF JUSTICE

| TO: (Name and Title of Staff Member) | DATE: |
| Mr Trautman- unit manager | Dec 29, 07 |
| FROM: | REGISTER NO.: |
| Djenasevic Fabil Anton | 41112-018 |
| WORK ASSIGNMENT: | UNIT: |
| ED-3 | 1-B   #208-L |

SUBJECT:  (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary.  Your failure to be specific may result in no action being
taken.  If necessary, you will be interviewed in order to successfully respond to your
request.)

Please inform me in how do I go about
Getting a Prisoner Transfer, to serve my
Sentence in Montenegro? And in fact
Does any such Agreement, Exist with the
United States with Respects to Prisoner
Transfer Agreements between the united-
States and Montenegro?! In other words
Is there any way for, me to Transfer my
Sentence, and to serve it in Montenegro?

                    Thank you Fabl A. Djeas...

(Do not write below this line)

DISPOSITION:

The United States currently does not have a treaty with
Montenegro, to facilitate a Treaty Transfer.


CliWinter  12/29/07

                    CASE MANAGER

*DB 2317/10/2002*
*QDP 14/300/10/2002*



**SERIAL NUMBER**

**A 799316**

English

# NOTICE OF RIGHTS IN TERMS OF THE CONSTITUTION

## (SECTION 35 OF ACT NO. 108 OF 1996)

(1)    You are being detained for the following reason:

*Extradition*

(2)    As a person who is detained you have the following rights:

(a)    you have the right to consult with a legal practitioner of your choice or, should you so prefer, to apply to the Legal Aid Board to be provided by the State with the services of a legal practitioner;

(b)    you have the right to challenge the lawfulness of your detention in person before a court of law and to be released if such detention is unlawful;

(c)    you have the right to be detained under conditions consonant with human dignity, which shall include at least the provision of adequate accommodation, nutrition, reading material and medical treatment at state expense; and

(d)    you have the right to be given the opportunity to communicate with, and be visited by, your spouse or partner, next-of-kin, religious counsellor and a medical practitioner of your choice.

(3)    As a person arrested for the alleged commission of an offence, you have the following rights:

(a)    you have the right to remain silent and anything you say may be recorded and may be used as evidence against you;

(b)    you are not compelled to make a confession or admission which could be used in evidence against you;

(c)    you have the right to be brought before a court as soon as reasonably possible but not later than 48 hours after your arrest or the end of the first court day after the expiry of the 48 hours, if the 48 hours expire outside ordinary court hours or on a day which is not an ordinary court day;

(d)    you have the right, at the first court appearance after your arrest, to be informed of the reason for your continued detention, or to be released; and

(e)    you have the right to be released from detention if the interests of justice permit, subject to reasonable conditions.

(4)    **You can exercise all the abovementioned rights at any stage during your detention.**

## CERTIFICATE BY DETAINEE

I, *Kabil Djenasevic* _____ (name of detainee) hereby certify that I have been informed in *English* _____ (state language) of my rights in terms of the Constitution as set out above by *Capt TE Ntjana* _____ (name of person who informed the detainee) and that I understand the contents thereof.

DATE: *2002/10/29*    TIME: *20:30*    PLACE: *Tresuria*
(Informed)                       (Informed)                       (Informed)

_____          _____
SIGNATURE/THUMBPRINT OF DETAINEE.          SIGNATURE OF PERSON WHO INFORMED THE DETAINEE

# CERTIFICATE BY THIRD PERSON AS WITNESS (if required)

I, *WO Ombigi Wisp SC Mbaeiso* _____ (name of member) hereby certify that *Kabil Djenasevic* _____ (name of detainee) has been informed in my presence in *English* _____ (state language) of his/her rights in terms of the Constitution as set out above by *Capt TE Ntjana* _____ (name of person who informed the detainee) and that the contents thereof has been explained to him/her but that he/she refuses to sign the above certificate.

DATE: *2002/10/29*    TIME: *20:30*    PLACE: *Pretoria*
(Informed)                       (Informed)                       (Informed)

Exhibit #11

I am Helen (Maiden: Mafilas) Djenasevic and am married to Kabil Anton Djenasevic. We are a family and take care of our daughter and I work part time as a warehouse/import controller in South Africa. We are unable to be at the sentencing today because we also are very involved in the "Oh Jah" feed the orphans program in South Africa. What started as a little volunteer work(I was approached for non-profit management systems I have knowledge of from the USA), now is a life time commitment to save 3-5yr olds daily from starvation in this program.

I could be there, but then 150 children would go without their bi-weekly meal which I personally am responsible for. The consequence is too dire, until we are able to get the management team into place, which we are vigorously working towards.

Just as every life is so valuable to all of us as a community of the world, so too is Kabil's life and physical presence in our lives irreplaceable to us. He is a wonderful father and husband and has supported us spiritually through this ordeal. He is a man of great moral standards and has allowed me to grow personally with the focus being on humanity and not only our nucleus of a family. He says that we are all capable of much larger deeds, no matter what circumstances we find ourselves in and we have to continue to strive to improve the quality of life for all humans that we encounter, even if it be with kindness in the smallest of gestures.

I know that he is not guilty of all the charges that are set before him, because of the illegality of the whole seizure from the day of his arrest in 2001. The Tampa police raided my condo in my absence and had the DEA tell me facts that I never saw evidence to or witnessed on my return to my condo complex, when I was approached by the DEA agents. The complex I lived in on Clearwater beach was a high rise complex with security doors downstairs, exclusive parking lots and to enter the condo building, one either rings the management office if the tenant does not electronically buzz you in via video phone. So when the police and DEA told me initially that they had permission to enter my condo, the question I asked then and now is, where are your search warrants if you are telling me all this information you gathered and you have had time to get warrants. Secondly, if you approached the management in my absence, they had keys to my condo and will let you in if you show them a badge. They were there during the office hours (8am-2pm weekdays) when management was on duty. All management told me was that they could schedule to have a new door and frame installed for me by the weekend. I was too afraid to take them up on it, and later made my own arrangements to repair the door.

In the extradition order from South Africa to Tampa, it clearly states that the DEA had search warrants. If they did, why were they not produced that day or the next day at the bank? Kabil also volunteered to return to the USA of his own accord, so that he could fight the case which now reflected exaggerated charges on the extradition order. Just as a matter of law in South Africa, all detainees are first returned to their country of origin before the course of extradition of bi-lateral treaties may be enforced (Kabil's country of origin is Montenegro) and he was not looking to avoid this case, but rather to clear the facts up, that is why he voluntarily returned at his expense to Tampa without looking to go through the return to Montenegro, and stretch the case out at the tax payers expense.

The evidence found at my condo was never discussed with me. I was just told that I could not claim any of the illegal substances found in my condo. That is when I wrote the affidavit I was told to write denying claim to any illegal evidence or actions. I repeatedly asked if I could call my attorney and was told only once the agents had left my condo I could do so.

Is it right that the law enforcement acts without regard of the law and intimidates and pressures people like myself with the threat of trouble if I help Kabil to make bail. I was very afraid of the police, not any other supposed criminals, so I changed my telephone number immediately and had my brother come down and live in a hotel while I made arrangements to get bail for Kabil, using my condo as collateral. He was only released about 6 weeks later after I worked with his friend, Ed Pero to get the deposit for the bail. My friend who was a reserve police person on Clearwater beach told me not to leave my condo for fear of it being seized illegally . I knew that anyone wanting to get into the building had to go through management or buzz up to my unit via video phone, so with the chair and lots of weight behind it, I continued to stay until we managed to have Kabil released on bail. We started to see attorneys to represent him, and he then started to live with me because I did not want to be alone in this situation. I thought that we would straighten this out and get to the reason for this illegal entry into my condo and bank accounts and safety deposit box the following day.

Kabil was out on bail for about 2 weeks and I continued to work on a new magazine with my brother (he is in the publishing business) in Tampa, and Kabil made calls and interviewed with various attorneys for his case from my condo. He met with the DEA agent and even told him that we decided to get married as we had previously planned. All seemed to be going fine when he then frantically called me one morning and told me that a detective from Tampa police had come to re-arrest him for a new charge. I called the bail bondsman and he told me to get further bail or Kabil would not be allowed out on another bail hearing. The detective, Jones from the police, this time left a very clear message with my management that he was coming back to get " the white South African" girl. That is when Kabil and I made a decision after he was granted additional excessive bail of $50,000 for his new charge, to leave the condo and get an attorney in New York.

We were never restricted from traveling by the bail bondsman and he knew that we were trying to get the fees together to fight this case.

We have been trying to clear this for 5 years now and these are the facts of the day of Kabil's arrest on 2 January 2001.

I ask that the court look at the actions and the responsibility of the law enforcement. Can they act without regard for the law and are they permitted to break the law in the interest of creating a case  with greater charges for the end  to their own means? Or can we trust in the legal system to uphold and allow people a fair trial based on real facts and evidence presented as well as fair representation discussed with state appointed attorneys?

We ask that the honorable judge when making your decision in Kabil's sentence, look at the facts and evidence and consider that Kabil has been awaiting some outcome to this for over 4 years now and is mentally tired and depressed from such long periods of solitary confinement. Kabil is looking just to continue with life and not get into further waiting and stressful case developments.

Please consider moving Kabil to Montenegro where his male cousins and extended family may have contact with him (we spoke with the Serbian/Montenegro Embassy and they will work with us for his transfer if the court grants it so) or if he may be transferred to New York state(they have successful re-habilitation programs), where his elderly mother lives and can keep contact with him more regularly for his health.

Kabil took the plea of guilty so that I can move forward with my life and not have to worry about him. Life does not go on any easier knowing that he is charged with exaggerated charges and has not been granted a fair representation thus far. Kabil being in the USA without family in proximity to support him while he tries to get some closure to this case just adds more strain to not only my plight, but his mother's and family that love him. Just as all wives love their husbands, so too do I love and support Kabil , and my heart is heavy with the knowledge of not being able to be in Florida to fight and work more successfully for Kabil's circumstance or case.

The only fair judgment will come from your assessment of what is supported by evidence when deciding Kabils' sentence and access for his mother to visit him. This is not only for Kabil, but for the possibility of making a change to a system that is not working for thousands of inmates who are trying to get some help/re-habilitation in their lives. Just as we started with 100 children to change humanity, I am positive, that the fair judging and sentencing has to start with the first person, Kabil, and that's all there is to begin change.

I thank the honorable judge for your time in listening to our statements and trust that you will make a fair and reasonable decision with your learned experience, in Kabil's sentencing.

note: In South Africa without Details +
"we" meaning in-laws trying to help!

I was in Solitary at Orient Rd Jail in Tampa
with no knowledge of Statement by wife til
Patrick Doherty produced it in court!?
at "Sentencing to the Court — Not me

To cure misquotes in Appeal and the
misconstrued Statement as it is not
pure or correctly quoted!!! by Jud
?

AL REPORTER, 2d SERIES

plinary infractions in prison, was obtained from Prison Disciplinary Committee Reports which stated that Mr. Sellers had been found guilty of the incidents after being given an opportunity to refute the charges. If this is true, then perhaps appellees met the requirements of the Act with respect to those pieces of information. But we do not know exactly which pieces of information, other than the 1979 report, Mr. Sellers is challenging. The district court below did not address his claims other than those concerning the 1979 presentence report. In so limiting its focus on remand, the court below misunderstood the scope of our first remand in this case. Accordingly, we now make it clear that Mr. Sellers is entitled, on remand, to a determination whether the agencies met the requirements of sections (e)(5) and (g)(1)(C) of the Act with regard to *all* of the information he claims is incorrect in his files.

*Sellers v BoP 959-F2d-307.DC cir 1992*

III. CONCLUSION

The Privacy Act requires that each agency keeping a system of records must maintain those records with "such accuracy, relevance, timeliness, and completeness as is reasonably necessary" to assure fairness to an individual. 5 U.S.C. § 552a(e)(5). If an agency willfully or intentionally fails to maintain records in such a manner and, as a result, makes a determination adverse to an individual, it will be liable to that person for money damages. 5 U.S.C. §§ 552a(g)(1)(C) and (g)(4). Because the challenged information in Mr. Sellers's files was capable of being verified, the agency did not satisfy the requirements of the Privacy Act simply by noting in his files that he disputed some of the information the files contained. Therefore, we remand for the district court to determine whether the Bureau of Prisons and the Parole Commission willfully or intentionally failed to maintain Mr. Sellers's records in accordance with sections (e)(5) and (g)(1)(C) of the Act. *See White v. Office of Personnel Management,* 787 F.2d 660 (D.C.Cir.1986) (in action for damages under Privacy Act, court must determine whether standard ar-

ticulated under section (g)(1)(C) has been met).

✓ *So Ordered.*



Arthur D. JACOBS, Appellant,

v.

William P. BARR,* et al., Appellees.

No. 91–5061.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 6, 1991.

Decided March 27, 1992.

American of German ancestry who had been detained in internment camp during second World War brought action challenging, on equal protection grounds, a federal statute which provided compensation for Japanese Americans similarly detained. The United States District Court for the District of Columbia, John Garrett Penn, Chief Judge, held that plaintiff had no standing to pursue action, and plaintiff appealed. The Court of Appeals, Mikva, Chief Judge, held that: (1) plaintiff had standing to bring equal protection challenge, but (2) statute would survive even the strictest level of scrutiny.

So ordered.

1. Constitutional Law ⚖42(2)

To have standing in constitutional sense, plaintiffs must allege that they have suffered some actual or threatened injury, injury must be fairly traceable to challenged official conduct, and there must be substantial likelihood that alleged injuries will be redressed by judicial decision in plaintiffs' favor.

* Richard Thornburgh was Attorney General of the United States when Mr. Jacobs filed his complaint on March 9, 1989. William P. Barr is

JACOBS v. BARR
Cite as 959 F.2d 313 (D.C. Cir. 1992)

2. Constitutional Law

To have standing t
tion on equal protectio
must allege that they
equal treatment solely
cation they are cha
Const.Amend. 14.

3. Constitutional Law

American of Germ
been detained in inter
second World War ha
lenge, as denial of l
rights, a federal statu
sation to Japanese A
been similarly intern
allege that he was in
sons as Japanese A
Const.Amend. 14; C
1988, § 101 et sec
§ 1989b et seq.

4. Federal Civil Pro
Federal Courts ⚖

In ruling on moti
of standing, both tria
must accept as true a
of complaint and mu
in favor of complaint

5. Constitutional La

Although courts
Congress on constitu
should defer, or give
gress on empirical (

6. Constitutional L
War and Nation

Federal statute
tion to Japanese A
detained in internm
War II, but not av
tion to Americans o
had likewise been o
the latter's equal
evidence that Japa
terned solely on ba
vidualized hearing
statute was narrow
government intere:

now Attorney Gene
tuted for Mr. Thor
43(c).

**11. Records ⬤≈31**

Prisoner adequately asserted the second element of his Privacy Act claim, agency intent, by alleging that certain Bureau of Prisons staff members "fabricated and falsified" his transfer memorandum to punish him for, among other things, filing administrative grievances, even though other Bureau staff members, in deciding to transfer prisoner, may have reasonably relied on the memorandum. 5 U.S.C.A. § 552a.

**12. Records ⬤≈31**

If proven, retaliatory fabrication of prison records would meet *Deters*'s definition of a "willful or intentional" Privacy Act violation, that is, a violation so patently egregious and unlawful that anyone undertaking the conduct should have known it unlawful. 5 U.S.C.A. § 552a.

See publication Words and Phrases for other judicial constructions and definitions.

**13. Records ⬤≈31**

Reasonable reliance by some employees cannot immunize an agency from the Privacy Act consequences of employing other individuals who allegedly deliberately falsify records. 5 U.S.C.A. § 552a.

**14. Records ⬤≈31**

Prisoner adequately asserted the third element of his Privacy Act claim, proximate causation; although defendant Bureau of Prisons argued that prisoner failed to allege with any admissible evidence that the allegedly inaccurate request for redesignation was the proximate cause of his transfer, in its district court motion to dismiss the Bureau had stated just the opposite, that prisoner was transferred based on the request for redesignation in his file, and the Bureau suggested no reason why it should not be held to its original characterization of the facts. 5 U.S.C.A. § 552a.

**15. Records ⬤≈31**

In the prison context, term "adverse determination," as used in the Privacy Act, denotes, at least, a decision that negatively affects an inmate's rights. 5 U.S.C.A. § 552a.

See publication Words and Phrases for other judicial constructions and definitions.

**16. Constitutional Law ⬤≈91**
    **Records ⬤≈31**

In determining whether prisoner, who claimed that he was transferred and reclassified by the Bureau of Prisons in retaliation for his filing of grievances, alleged a deprivation of his First Amendment rights adequate to constitute an "adverse determination" within meaning of the Privacy Act, the Court of Appeals would consider two questions: whether prisoner was exercising his First Amendment rights when he filed the grievances and, if so, whether the Bureau's alleged response was sufficiently severe to constitute actionable retaliation. U.S.C.A. Const.Amend. 1; 5 U.S.C.A. § 552a.

**17. Constitutional Law ⬤≈91**
    **Records ⬤≈31**

Prisoner was exercising his First Amendment rights when he filed administrative grievances against Federal Correctional Institute (FCI) staff members who allegedly harassed and intimidated him, for purposes of determining whether prisoner, who claimed that he was transferred and reclassified by the Bureau of Prisons in retaliation for his filing of grievances, alleged a deprivation of his First Amendment rights adequate to constitute an "adverse determination" within meaning of the Privacy Act. U.S.C.A. Const.Amend. 1; 5 U.S.C.A. § 552a.

**18. Constitutional Law ⬤≈91**

Prisoners retain their First Amendment right to petition the government for

a redress of grievances. U.S.C.A. Amend. 1.

**19. Constitutional Law ⬤≈91**

Prisoners' First Amendment right to petition the government for redress of grievances extends not just to the courts but also to the various preliminary steps necessary to exhaust administrative remedies prior to seeking judicial relief. U.S.C.A. Const.Amend. 1.

**20. Prisons ⬤≈4(13)**

Access to courts for prisoners entails not only freedom to file lawsuits, but also freedom to employ the remedies without which legal claims cannot be effectively asserted. U.S.C.A. Amend. 1.

**21. Prisons ⬤≈13(1)**

Although prison officials may limit inmates' ability to file administrative grievances, provided the limitations are reasonably related to legitimate penological interests, officials may not retaliate against prisoners for filing grievances that are truthful and not otherwise adverse to such interests. U.S.C.A. Amend. 1.

**22. Constitutional Law ⬤≈90**

Widely accepted standard for determining whether harassment of prisoner for exercising the right of free speech is actionable depends on whether the government action is likely to deter a person of ordinary firmness from that exercise. U.S.C.A. Const.Amend. 1.

**23. Prisons ⬤≈13(5)**

Alleged transfer and reclassification of prisoner as a "special offender" as retaliation for the exercise of his First Amendment rights, if proven, constituted an "adverse determination" under the Privacy Act, where reclassification allegedly barred prisoner from obtaining tutoring at a new Federal Correctional Institution akin to those at which he had

**DETERS v. U.S. PAROLE COM'N**    **657**
Cite as 85 F.3d 655 (D.C. Cir. 1996)

probation officer who
...ntence investigation re-
ted 24 kilograms of cocaine
the third plane trip and 12
Deters objected to the PSI
t he smuggled only 12 kilo-
all on the fourth trip. The
made no finding on the
declining to take quantity
entencing Deters to 20 years

he Commission's regulations,
er ordinarily receives an ini-
ng within 120·days after he is
8 C.F.R. § 2.12(a). In antici-
s's initial hearing the Com-
ed a "preliminary assessment
him. Deters received a copy
neet in January 1986. It
th a parole guideline range of
." The range was based in
ategory Eight" severity rating
ehavior. The Category Eight
was based on the PSI's attri-
ilograms of cocaine to his of-
the quantity been 12 kilo-
nse behavior would have had a
en rating, *supra* note 1, and
the worksheet would have re-
ole guideline range of 52–80
er receiving the preliminary as-
ters waived his initial parole

·92 Deters had served one-third
of his 20–year sentence and thus
ily eligible for parole. *See* 18
·5(a). In June 1992 he requested
·ole hearing which was scheduled
ber 1992. In August 1992 he
ommission to challenge the accu-
PSI. Deters explained that al-
coconspirator had testified that
ggled 12 kilograms of cocaine on
·lane trip and 12 more on the
ther coconspirator, allegedly more
·n the first, had suggested in his
·ony, and had since declared in an

more kilograms of cocaine; Category
distribution of, or possession with in-
stribute, between 6.25 and 18.74 kilo-
·ocaine).

affidavit, that Deters smuggled no cocaine on the third trip. The Commission promptly informed Deters by letter that his challenge to the PSI would be placed in his file and considered at his scheduled parole hearing. Deters, however, waived the parole hearing after receiving a preliminary assessment worksheet that matched the one he had received in January 1986.

This sequence was repeated several times throughout the next year: Deters applied for parole and filed a challenge to the accuracy of the PSI; the Commission explained to him that it would address his challenge and examine the accuracy of his records at his parole hearing; Deters then waived his scheduled parole hearing and therefore waived parole consideration. He apparently refuses to attend an initial hearing until the Commission amends his file to manifest that his offenses involved only 12 kilograms of cocaine.

In October 1993 Deters filed suit pursuant to subsections (e)(5), (g)(1)(C), (g)(1)(D) and (g)(4) of the Privacy Act, 5 U.S.C. § 552a, claiming that the Commission's alleged intentional or willful failure to maintain accurate records had caused him $365,000 in damages. The district court granted the Commission's motion for summary judgment. Our review is de novo.

## II

The Commission maintains a system of records on federal inmates and therefore is subject to the Privacy Act. Subsection (e)(5) of the Act requires an agency to "maintain all records which are used by the agency in making any determination about any individual with such accuracy ... as is reasonably necessary to assure fairness to the individual in the determination." Subsection (g)(1)(C) provides a civil remedy if an agency fails to satisfy the standard in subsection (e)(5) "and consequently a determination is made which is adverse to the individual." Pursuant to subsection (g)(4), a plaintiff bringing an action under subsection (g)(1)(C) may recover actual damages if "the court determines that the agency acted in a manner which was intentional or willful."

In order to prevail on his claim for money damages pursuant to subsections (g)(1)(C) and (g)(4), Deters must prove the following: (1) he has been aggrieved by an adverse determination; (2) the Commission failed to maintain his records with the degree of accuracy necessary to assure fairness in the determination; (3) the Commission's reliance on the inaccurate records was the proximate cause of the adverse determination; and (4) the Commission acted intentionally or willfully in failing to maintain accurate records. *See Dickson v. Office of Personnel Management,* 828 F.2d 32, 37 (D.C.Cir.1987); *Rose v. United States,* 905 F.2d 1257, 1259 (9th Cir.1990). We affirm the district court's grant of summary judgment, concluding as a matter of law that the Commission neither *intentionally* nor *willfully* failed to maintain Deters's records with accuracy sufficient to assure fairness to him in a parole determination. We first address two issues that bear to some extent on the "intentional or willful" issue: whether the agency failed to maintain his records with sufficient accuracy and whether the agency made an adverse determination.

[1] We begin with the accuracy of Deters's records. As early as August 1992 Deters explained to the Commission that the probation officer who prepared the PSI derived the 24–kilogram figure from the trial testimony of coconspirator and government witness Anthony Benanti: Benanti testified that Deters smuggled 12 kilograms of cocaine on the third plane trip and another 12 kilograms on the fourth trip. Deters pointed out, however, that another coconspirator and government witness, Walter Schieche, testified about cocaine only in connection with the fourth trip. Deters highlighted the trial transcript pages that contained Benanti's and Schieche's testimony discussing cocaine and the third plane trip. He also included Schieche's post-trial affidavit which declared that no cocaine had been smuggled on the third trip. In addition, Deters submitted materials designed to discredit Benanti and establish Schieche as the more reliable witness.

On receiving his comprehensive rebuttal to the PSI, the Commission placed it in his file